**UNITED STATES of America**

v.

**Timothy Wayne GUESS, Defendant.**

**Criminal Action No. 2:10cr140.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Dec. 3, 2010.

Kevin M. Comstock, United States Attorney's Office, Norfolk, VA, for United States of America.

Keith Loren Kimball, Office of the Federal Public Defender, Norfolk, VA, for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

On October 15, 2010, pursuant to Rule 12(b)(3)(c) of the Federal Rules of Criminal Procedure and the Fifth Amendment to the United States Constitution, the Defendant filed a Motion to Suppress certain statements he made to law enforcement during an investigation of drug and firearm offenses in which he was allegedly involved. Both parties have filed briefs on the issues, and a hearing took place on November 23, 2010. At that hearing, both parties informed the Court that they had reached an agreement on many of the issues raised in the Defendant's Motion to Suppress. As to the issues that had not been resolved, the Government presented evidence. Based on the applicable facts and case law, the Court hereby **GRANTS IN PART** Defendant's Motion to Suppress.

### I. Facts

During the suppression hearing, the Government called two witnesses, Detectives Nick Marcus and Victor Montalvo, both with the Norfolk Police Department Vice and Narcotics Division. Although Detective Marcus was the first to testify, Detective Montalvo's involvement in the situation occurred first chronologically. As a result, the Court will address his testimony at the outset.

According to Detective Montalvo, on June 23, 2010, the Norfolk Police Department arrested an individual for possession of methamphetamine. After this arrest,

Detective Montalvo had conversations with this individual which resulted in her agreeing to cooperate with law enforcement by becoming a confidential informant ("CI"). In this capacity, the CI agreed to place an order with her drug supplier for three grams of methamphetamine. She described this drug supplier as an older white male named Tim ("Guess" or "Defendant").[1] To place this order, the CI called the phone number she had for Guess and left a message.[2] This phone call directly from the CI to Guess was a bit of an anomaly. Typically, she did not deal directly with him, as she generally received her drugs through a middleman. However, in this instance, when Guess returned her initial phone call, she told him that she was tired of getting "ripped off" by the middleman and she wanted to buy drugs directly from him. As a result, Guess agreed to meet her at her apartment in the 400 block of Harvard Street, in the City of Norfolk.

After arranging the sting operation, Detective Montalvo drove with the CI to the scene of the prospective drug deal. While in route, the CI received a phone call from Guess, telling her that he was already at the location. When they arrived, Montalvo and the CI drove by the CI's residence without stopping. During this drive-by, both Montalvo and the CI saw an individual standing in front of the entrance to her residence. At that time, the CI identified the individual as "Tim," the man she talked to on the phone. Subsequently, during the suppression hearing, Montalvo identified "Tim" as Tim Guess, the Defendant. Also during that drive-by, the CI identified a white pickup truck parked at

---

**1.** Although the CI did not refer to "Tim" as Tim Guess at the time she set up the drug deal, officers later identified "Tim" as Tim Guess.

**2.** This finding of fact is for the purpose of suppression only. At the hearing, the Defense counsel did not concede that the CI actually spoke to the Defendant on the phone.

the scene as Guess' truck. Detective Montalvo then relayed this information to other detectives involved in the sting operation.

Detective Marcus was one of those other detectives involved. According to Marcus' testimony, on June 23, 2010, he discussed the potential methamphetamine sting operation with Detective Montalvo. During this conversation, Detective Montalvo advised him that Guess would be going to Harvard Street and driving a white pickup truck in order to sell methamphetamine to a confidential informant with whom Montalvo was working. Based on that information, Marcus went to the CI's residence to wait for the white pickup truck to arrive. However, when Detective Marcus arrived, Guess was already standing in front of the building. Additionally, the white pickup truck that supposedly belonged to Guess was parked in front of the building.

Based on the foregoing information, Detective Marcus, along with Detectives Allison and McCarthy, made contact with Guess and placed him in custody. While placing him in custody, Detective McCarthy advised Marcus that he found a firearm on Guess. The detectives then moved Guess from the front of the building to the side, and conducted a full search of his person. During that search, the detectives found a quantity of drugs, and Marcus discovered a set of keys on an orange lanyard hanging around Guess' neck. After removing the keys from Guess' neck, Detective Marcus asked Guess if he had a vehicle. In response, Guess informed the Detective that he did have a vehicle, and it was the white pickup truck parked in front of the apartment complex. According to Detective Marcus' testimony, even before asking the question regarding the vehicle, the Detective had hoped to search the white pickup truck after the arrest. Detective Marcus next asked Guess if he would consent to a search of that vehicle. Guess declined to grant consent and asked if the detectives had a search warrant. Detective Marcus acknowledged he did not have a search warrant. Guess subsequently invoked his right to counsel, and all questioning ceased. The detectives did not provide Guess with his *Miranda* warnings at any point during this encounter.

Detective Marcus then took the keys from the orange lanyard and walked towards the white pickup truck that Guess identified as his own. He noted the vehicle was a Ford F–150 pickup truck with a Virginia license plate reading XLH–1947. With this information, he ran a Department of Motor Vehicle registration check and determined that the vehicle was registered to a Timothy Guess and his wife. Detective Marcus also requested that a K–9 Unit respond to the scene to screen the truck. When the K–9 arrived, it conducted an initial screening of the truck and alerted to a positive odor of narcotics. The police then searched the truck and discovered more drugs and another firearm. Detective Marcus testified that even before searching the vehicle, based on his experience and the fact that the defendant was arrested with narcotics and a firearm, he would not have been comfortable leaving the vehicle at the scene.

## II. DISCUSSION

In the Defendant's Motion to Suppress, he initially moved to suppress evidence that can be divided into three categories. The first category involves statements the Defendant made to law enforcement at the scene of the arrest. Addressing this category of statements, the Defendant moved to suppress any statements he made to law enforcement regarding the fact that he had a vehicle, as well as statements identifying the white pickup truck as his own. In a related issue not addressed in the

briefs but raised sua sponte by the Court during the suppression hearing, the Court asked the parties whether the Defendant's statements refusing to grant consent to search the vehicle were also the subject of the suppression motion. The parties acknowledged that the issue could arise during trial, and thus the Court will address it as well. Second, the Defendant moved to suppress any physical evidence found in his pickup truck on the grounds that it was tainted by the prior unwarned statements. Third, the Defendant moved to suppress any statements he made to Detective Marcus after his arrest, while in a holding cell awaiting transfer to the Norfolk City Jail.

Prior to the suppression hearing, the parties came to an agreement regarding the physical evidence found in the truck and statements made to Detective Marcus while in the holding cell. As a result, the only issue left for this Court to resolve is the admissibility of statements the Defendant made to Detective Marcus during the initial conversation at the time of his arrest. The relevant conversation consisted of two statements—the Defendant's statement regarding ownership of a vehicle, and his refusal to grant law enforcement consent to search that vehicle. The Court will deal with each of these statements in turn.

### A. Statement Regarding Ownership of the Pickup Truck

The Defendant's principal contention regarding his statements surrounding ownership of the pickup truck is that those statements should be suppressed because they were obtained, without the benefit of *Miranda* warnings, during the course of a custodial interrogation. In support of this contention, the defense cites *Miranda v. Arizona,* for the premise that any statement obtained as a result of custodial interrogation of a defendant may not be used against him in a criminal trial unless the Government can show that the police

provided procedural safeguards sufficiently effective to secure the suspect's Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In this case, the Defendant asserts that any statement he made regarding his pickup truck occurred after he was placed in custody, in response to police interrogation, without having been advised of his *Miranda* rights. Therefore, the Defendant contends that the statements should be suppressed.

### 1. Miranda Does Apply

The Court must first address whether the Supreme Court's ruling in *Miranda* applies to the facts in the present case. If it does not, there is no need to suppress the oral statements regarding the pickup truck under the Fifth Amendment.

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege, however, is not limited to courtroom proceedings. It attaches when a defendant is subject to custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 467–68, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). " '[T]he prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " *United States v. Jamison,* 509 F.3d 623, 628 (4th Cir.2007) (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602), "Custodial interrogation 'mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Id.* While the Government does not contest in its brief that the Defendant was in custody at the time he was asked about

his vehicle, they do assert that this is not the type of interrogation to which *Miranda* applies.

### a. Interrogation

■ The Supreme Court defined interrogation for *Miranda* purposes in *Rhode Island v. Innis. United States v. Payne*, 954 F.2d 199, 201 (4th Cir.1992). In *Innis* the Court stated that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). While express questioning is self-explanatory, the "functional equivalent" branch of interrogation refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. *See also Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 183, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)("The Fifth Amendment prohibits only compelled testimony that is incriminating."). The Supreme Court further noted that "incriminating response" refers to "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Innis*, 446 U.S. at 302 n. 5, 100 S.Ct. 1682.

While the language in *Innis* could be construed as requiring *Miranda* warnings any time a person in custody is asked an express question, many courts have not adopted such an interpretation. Those courts, which include the Fourth Circuit, in which this Court sits, typically hold that express questioning only amounts to interrogation under *Miranda* if the questions are "reasonably likely to elicit an incriminating response." *See, e.g., United States v. Allen*, 13 F.3d 105, 109–10 (4th Cir.1993) (applying the "reasonably likely to elicit an incriminating response" test to express questioning); *United States v. Hogan*, 539 F.3d 916, 922 (8th Cir.2008).[3] Therefore, this Court must determine if the express questioning by the police officers in this case was reasonably likely to elicit an incriminating response.

### i. Likely to Elicit an Incriminating Response

Since Detective Marcus' question to the Defendant dealt with ownership of a vehicle, this Court has surveyed analogous cases to determine if other courts have addressed the issue of whether such a question, in this context, is reasonably likely to elicit an incriminating response. In *United States v. Brown*, the Fourth Circuit addressed a case with some factual similarity to the present case, but also key differences. In that case, agents with the Bureau of Alcohol, Tobacco, and Firearms entered an apartment where the defendant was located. *United States v. Brown*, No. 97–4676, 1998 WL 637413, at *1, 1998 U.S.App. LEXIS 22311, at *2 (4th Cir. Sept. 11, 1998) (unpublished). They immediately handcuffed the defendant and began searching the apartment. *Id.* While searching the apartment, the agents noticed a set of keys inserted in a door. They asked the suspects who the keys

---

**3.** However, other courts have reached the opposite conclusion. For example, in *United States v. Montgomery*, the First Circuit held that express questioning amounts to interrogation and the court need not delve into the issue of whether the question was reasonably likely to elicit an incriminating response. *See United States v. Montgomery*, 714 F.2d 201, 202 (1st Cir.1983); *See also Smiley v. Thurmer*, 542 F.3d 574, 583 (7th Cir.2008) ("Because Mr. Smiley was in custody and was subject to express questioning, the state court of appeals had no reason to apply the rule for "the functional equivalent" of express questioning.").

belonged to, and the defendant responded that they were his. *Id.* at *1, 1998 U.S.App. LEXIS 22311 at *3. Later, the officers asked for consent to search the defendant's car (which the defendant granted), and asked which of the keys was the applicable car key. *Id.* The defendant sought to suppress his statements regarding the keys on the ground that they were obtained during custodial interrogation without the benefit of *Miranda* warnings. *Id.* at *2–3, 1998 U.S.App. LEXIS 22311 at *9.

On the issue of interrogation, the *Brown* Court concluded that it must judge whether questioning is reasonably likely to elicit an incriminating response by looking at the suspect's perceptions, the nature of the question asked, and the attendant circumstances. *Id.* at *3–4, 1998 U.S.App. LEXIS 22311 at *10–11 (citing *United States v. Payne*, 954 F.2d 199, 202–03 (4th Cir. 1992)). The Court concluded, based on those factors, that the identification of the car key in the course of giving consent to search the vehicle did not support the contention that the defendant considered himself under interrogation at the time. *Id.* at *3, 1998 U.S.App. LEXIS 22311 at *11. Consequently, since these questions were not an interrogation for *Miranda* purposes, any responses by the defendant were not obtained in violation of *Miranda*. *Id.* See also *United States v. Barrios*, 07 Cr. 658, 2007 WL 3256945, at *3–4, 2007 U.S. Dist. LEXIS 81136, at *10–11 (S.D.N.Y. Nov. 1, 2007) (holding that a question regarding ownership of a car when not related to investigation of a crime need not be preceded by *Miranda* warnings for such statements to be admissible); *People v. Huffman*, 41 N.Y.2d 29, 390 N.Y.S.2d 843, 359 N.E.2d 353, 356–57

(Ct.App.N.Y.1976) (noting that *Miranda* does not apply to a single question propounded to the defendant while the officers are first assessing a potential criminal situation because that does not constitute interrogation).

However, in a similar case, the Court of Appeals for the First Circuit reached a different conclusion. In *United States v. Downing*, law enforcement personnel suspected that a parcel of property in Maine was being used in connection with violations of federal drug laws. *United States v. Downing*, 665 F.2d 404, 405 (1st Cir. 1981). Law enforcement discovered the defendant in a house on the property. Upon receiving his *Miranda* warnings, the Defendant invoked his right to counsel. *Id.* The defendant was then turned over to another officer for booking procedures. *Id.* When that officer asked the defendant to empty his pockets, the defendant produced a set of keys. *Id.* The officer asked what the keys were for, to which the defendant replied, an airplane. *Id.* The officer then asked where the plane was located, and the defendant told him the location. *Id.* However, the defendant refused to grant consent to search the plane. *Id.* Ultimately, law enforcement personnel searched the plane and found evidence that implicated the defendant in a drug conspiracy. *Id.* The First Circuit concluded that the questioning regarding the keys constituted interrogation for *Miranda* purposes because, in that context, the questions were "reasonably likely to elicit an incriminating response." *Id.* at 406–07.[4]

Similarly, other courts have held that a question regarding ownership of certain

---

**4.** While the Court held that the questioning was reasonably likely to elicit an incriminating response, it also held that it need not delve into the determination of that issue because "express questioning" as a rule satisfies the definition of interrogation. *United States v. Downing*, 665 F.2d 404, 406–07 (1st Cir. 1981).

items may qualify as an interrogation for *Miranda* purposes. For example, in *Smith*, the Seventh Circuit held that there is a difference between a request for consent to search and inquiries regarding ownership of what is to be searched. *United States v. Smith*, 3 F.3d 1088, 1098–99 (7th Cir.1993). In that case, during a police search of a taxi cab, the police asked a defendant if the bag they were holding belonged to him. *Id.* at 1093. After the defendant confirmed that he owned the bag, he consented to its search. *Id.* The court held that while a consent to search is not self-incriminating and therefore a request to search does not rise to the level of interrogation, when an officer "inquires as to ownership of that which is searched, the inquiry crosses the threshold into testimonial incrimination and is therefore barred unless the safeguards of Miranda have been put in place." *Id.* at 1098. In some situations, ownership has "the very real capacity to incriminate." *Id.* at 1099. *See also United States v. Henley*, 984 F.2d 1040, 1043 (9th Cir.1993) (holding that where a car is linked to a crime, asking about ownership of the car could be reasonably likely to elicit an incriminating answer); *United States v. Monzon*, 869 F.2d 338, 342 (7th Cir.1989) (holding that questions regarding ownership of a vehicle could clearly have incriminating potential); *United States v. Beltran*, No. 2:08–cr–88, 2008 WL 4790413, at *5–6, 2008 U.S. Dist. LEXIS 90941, at *14–15 (M.D.Fl. Oct. 30, 2008), *aff'd*, 367 Fed.Appx. 984 (11th Cir. 2010) (holding that, to be admissible, an officer's question regarding whether the defendant has keys to an automobile must be preceded by *Miranda* warnings if the factual situation resembles an arrest); *United States v. Mauvais*, 948 F.Supp. 492, 493–94, 495 (D.Vi.1996) (suppressing statements made regarding ownership of a vehicle prior to receiving *Miranda* warnings).

### ii. Application

■ For the following reasons, in the present case, the Detective's question regarding whether Guess had a vehicle qualifies as an interrogation for *Miranda* purposes. It was an express question that was reasonably likely to elicit an incriminating response. Based on the testimony of the two detectives, Detective Montalvo knew in advance of the sting that the Defendant would likely be driving a white pickup truck. Further, he communicated that information to Detective Marcus. Therefore, as Detective Marcus testified at the hearing, the purpose of Detective Marcus' question was to have Guess himself establish that the white pickup truck belonged to him. A statement by Guess that he owned the vehicle could be used against Guess at trial if incriminating evidence was found in the vehicle. Since the Detective's next question of Guess was whether he could search the truck, the Detective was clearly interested in the truck for investigative purposes.[5]

Moreover, unlike the Fourth Circuit's *Brown* case, based on the circumstances of the questioning here, Guess likely considered himself to be under interrogation.

---

5. Compare the factual situation in the present case to a case such as *Wisconsin v. Thorbahn* from the Court of Appeals of Wisconsin. In that case, officers asked a suspect that was arrested for indecent exposure whether he had a car parked on the streets. When he told the officers where it was parked, they found the vehicle, with stolen property inside it that was unrelated to the initial charge. The court found that the question did not constitute interrogation because the officer had no prior knowledge the vehicle existed or that any vehicle was relevant to the defendant's crimes. As a result, the officer had no reason to know that the response might be incriminating. *Wisconsin v. Thorbahn*, 112 Wis.2d 669, 332 N.W.2d 313 (Wis.Ct.App. 1983).

This can be gleaned from Guess' response to police questioning. In response to the request to search the truck, Guess declined to give consent and asked the detective if he had a warrant. This is hardly the response of a man who believes he is engaging in an amicable discussion with law enforcement. This is in contrast to the defendant in *Brown*, who granted consent to search his vehicle. Since Detective Marcus knew in advance that the vehicle reportedly belonged to Guess, and since the Detective knew a drug crime was being investigated, it was reasonably likely that questioning regarding ownership of the vehicle would elicit an incriminating response if incriminating evidence was found in such vehicle. Therefore, Detective Marcus' question regarding ownership of the vehicle amounts to an interrogation for *Miranda* purposes. Having obtained Guess' statement prior to reading him any *Miranda* warnings, the statement elicited by Detective Marcus' question must be suppressed unless there is an applicable exception to *Miranda*.

### 2. Booking Exception

■ One such potential exception is the booking exception. In *Pennsylvania v. Muniz*, the Supreme Court held that there exists a "routine booking exception" to *Miranda*. *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). Under this exception, certain questions asked for the *purpose* of booking a suspect who has been arrested are exempt from *Miranda's* coverage, and the answers are thus admissible even if no *Miranda* warnings have been given. For example, in *Muniz*, the Court held that a suspect's answers to police questions regarding his height, weight, address, eye color, date of birth and current age were reasonably related to "police administrative concerns'" and thus were admissible even without prior *Miranda* warnings. *Id.*

at 601–02, 110 S.Ct. 2638. However, the Supreme Court also noted that the booking exception "does not mean, of course. Chat any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Id.* at 602 n. 14, 110 S.Ct. 2638.

The Fourth Circuit Court of Appeals has analyzed the booking exception in numerous published and unpublished opinions. For example, in *United States v. Fenner*, a defendant was questioned regarding an unsolved murder several weeks after his arrest on separate drug charges. *United States v. Fenner*, No. 93–5955, 1994 WL 637257, at *1–2, 1994 U.S.App. LEXIS 32881, at *3–4 (4th Cir. Nov. 15, 1994). During this interview, a detective filled out a booking sheet about the defendant. *Id.* at *1–2, 1994 U.S.App. LEXIS 32881 at *4. In order to complete this form, the defendant told the detective his name, nickname, race, sex, age, marital status, height, weight, complexion, address, social security number, parents' names, and education. *Id.* The court held that even though "the booking exception is … narrow," *Id.* at *3, 1994 U.S.App. LEXIS 32881 at *8, these statements were basic identifying information and were properly within the exception.

In *United States v. D'Anjou*, the Fourth Circuit elaborated on the meaning of the booking exception. There, the court stated that "there exists an exception to *Miranda's* coverage for routine booking questions securing 'biographical data necessary to complete booking or pretrial services[.]'" *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir.1994) (quoting *Muniz*, 496 U.S. at 601, 110 S.Ct. 2638). However, the court required that "this exception does not apply to ques-

tions, even during booking, that are designed to elicit incriminatory admissions." *Id.* In that case, the court held that information regarding a defendant's nationality and address could properly fall under the booking exception. *Id.* at 609. *See also United States v. Taylor,* 799 F.2d 126, 128 (4th Cir.1986).

The Ninth Circuit addressed a situation factually similar to the present case in *United States v. Henley.* There, a bank was robbed and a Plymouth Duster was used as the getaway car. *United States v. Henley,* 984 F.2d 1040, 1041 (9th Cir.1993). The police eventually found the vehicle and arrested Brian Henley. *Id.* While handcuffed, and without the benefit of *Miranda* warnings, Henley was asked whether he owned the vehicle, and he said he did. *Id.* He also consented to a search of the vehicle. *Id.* Although the prosecutors were unable to charge Henley in the robbery that initially peaked their suspicion, they used evidence discovered in the car to link him to a different robbery. *Id.*

■ At trial, Henley moved to suppress his statement, that he owned the car, on the grounds that it was taken in violation of *Miranda,* given the fact that the prosecution used his statement to lay the foundation for the introduction of the evidence found within the car. *Id.* at 1041–42. In determining whether the question regarding the car amounted to interrogation, the court noted that some questions, such as asking the defendant's name, birth date, and address, typically do not fall under the protection of *Miranda* because "police officers typically have no reason to believe a suspect will incriminate himself by answering such questions." *Id.* at 1042. However, when a police officer has reason to know that a suspect's answer may incriminate him, what once was an innocuous routine question may take the form of an

incriminating question that is then covered by *Miranda.* *Id.*

In its analysis of the facts before it, the Court noted that the police officers had already identified Henley's car as the one involved in a bank robbery. *Id.* Further, there was some doubt regarding who owned the car. *Id.* Therefore, an officer investigating the robbery should have known that asking an individual if he is the owner of a car used in the robbery is reasonably likely to lead to an incriminating response. *Id.* Consequently, *Miranda* applied, and the statements were suppressed because the police obtained them without the benefit of *Miranda* warnings. *Id.* at 1043–44. *See also United States v. Pacheco–Lopez,* 531 F.3d 420, 423–24 (6th Cir.2008) (applying the booking exception to questions regarding police administrative concerns but not questions reasonably likely to elicit an incriminating response); *United States v. Gaston,* 357 F.3d 77, 86–87 (D.C.Cir.2004) (Rogers, J., concurring) (holding that the booking exception applies to "questions that are necessary to assist the police in carrying out administrative functions" but not those designed to elicit incriminating admissions).

■ In the present case, and based on these specific facts, asking the Defendant whether or not he had a vehicle does not fail within the routine booking exception. The booking exception generally applies to biographical information necessary to fill out appropriate booking paperwork or comply with required booking procedures. Typically, the information that falls within the booking exception consists of facts about the defendant such as name, height and date of birth. The exception is for very limited administrative purposes, not for obtaining incriminating statements. As the Ninth Circuit stated in *Henley,* even information that appears administrative in one context can mutate into incrimi-

natory information if used for a unique purpose. *See Henley,* 984 F.2d at 1042.

Here, the question about ownership of the vehicle was reasonably likely to elicit an incriminating response. At the time of the arrest, the officers already suspected that the Defendant owned a white pickup truck and drove that pickup truck to the scene of the methamphetamine transaction. Moreover, Detective Marcus openly and without hesitation forthrightly testified that, at the time he asked the vehicle question, he hoped to search the truck after the arrest. While knowing whether the Defendant owned the truck may be relevant to booking him,[6] the *primary purpose* of the question was to have the Defendant connect himself to the truck in his own words, and ultimately to any evidence the police hoped to obtain during a search of the vehicle.

Further, there is no showing that the detectives were actually booking the Defendant when they asked him whether he had a vehicle. At the time of the Defendant's statements, he had just been arrested and was being escorted to a police vehicle. The circumstances do not reflect a question and answer scenario consistent with a routine administrative booking. Although the question of whether or not the suspect was formally being booked is not dispositive to this inquiry, a question asked pursuant to a normal booking procedure might appear, based on the surrounding circumstances, less likely to lead to an incriminating response than one asked immediately following an arrest.

For the reasons stated above, the booking exception to *Miranda* is inapplicable on these facts.

### 3. General On–the–Scene Question

■■■ The Government next contends that the question regarding the vehicle also falls into a "general on-the-scene" questioning exception to *Miranda.* In the *Miranda* case itself, the Supreme Court noted that the "decision is not intended to hamper the traditional function of police officers in investigating crime." *Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.

*Id.* at 477–78, 86 S.Ct. 1602. While the *Miranda* decision was designed to mitigate the effects of coercive police practices that improperly "persuade, trick, or cajole [the suspect] out of exercising his constitutional rights," *Miranda,* 384 U.S. at 455, 86 S.Ct. 1602, such coercion is not generally present during such general on-the-scene investigations.

---

**6.** While the Court is cognizant of the fact that the Norfolk Police Department's Arrest and Detention Worksheet does have a field for vehicle information, Ex. S–5, Nov. 23, 2010, ECF No. 42–1, that does not alter the Court's calculus as to whether the booking exception applies in this case. This decision does not withhold such information from the police, it merely requires that the police obtain such information within the bounds of *Miranda.* As the *Henley* court observed, when a police officer has reason to know that a suspect's answer may incriminate him, what once was an innocuous routine question, such as a question on a booking form, may take the form of an incriminating question that then becomes subject to *Miranda.*

The Fourth Circuit has addressed this "general on-the-scene" exception to *Miranda* in several cases. First, in *United States v. Williams,* a police officer witnessed the defendant discard a wallet in an airport restroom trash can. *United States v. Williams,* 405 F.2d 14, 15 (4th Cir.1968). Without reading *Miranda* warnings, the officer asked Williams about the wallet, to which Williams replied he had never seen it before. *Id.* Williams was unable to explain how he came in contact with the wallet. In admitting the defendant's statement and convicting him, the District Court relied in part on the judicial presumption that one who is in unexplained possession of stolen goods is the thief. *Id.* The defendant contended that his statements, and thus the presumption that he was the thief, should have been inadmissible in light of the officer's failure to read him *Miranda* warnings. *Id.* at 15. The court disagreed, holding that the *Miranda* decision was meant to mitigate the coercive effect of police-dominated questioning, and did not apply to this general on-the-scene questioning of suspicious circumstances. *See id.* at 16.

In *United States v. Jamison,* the Fourth Circuit again addressed the "general on-the-scene" exception to *Miranda.* In that case, the defendant arrived at the hospital complaining of a gunshot wound to the groin. *United States v. Jamison,* 509 F.3d 623, 625 (4th Cir.2007). While the defendant received treatment from the hospital staff, police officers investigated the crime. *Id.* at 626. The investigation consisted of asking the defendant questions, affixing paper bags to his hands in order to avoid the contamination of potential gun shot residue that might be on his skin, and taking pictures of the wounds. *Id.* at 626–27. All of these actions occurred without the police administering *Miranda* warnings. The Fourth Circuit ultimately determined that *Miranda* did not apply because the defendant was not in custody. *Id.* at 632.

■ In determining whether the defendant was in custody for *Miranda* purposes, the Court noted that *Miranda* is often inapplicable to general on-the-scene police investigation of a crime because a reasonable person subject to such questioning often "would not feel deprived of his freedom" and "restrained by the police," and thus there is no custody for *Miranda* purposes. *Id.* at 631–33. Although any questioning of a suspect by a police officer will have coercive aspects to it, without more, general on the scene questioning by an officer is not the type of compelling atmosphere that necessitates *Miranda* warnings. *Id.*

■ In the present case, although the questioning occurred on the scene and in some respects could be construed as "general," the question regarding 'whether the Defendant had a vehicle does not fall within the general on-the-scene exception to *Miranda.* In a typical case where the exception applies, the crux of the issue is whether the defendant is actually in custody during the time of the questioning. If a reasonable person would not feel "restrained by the police," the conversation is more likely classified as general questioning because there is less compulsion to answer any questions propounded by the police and less risk of compelled self-incrimination during a criminal interrogation. *See Jamison,* 509 F.3d at 631 (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)) (noting that the *Miranda* line of cases do not equate police investigation with coercion even though "any interview of one suspected of a crime by a police officer will have coercive aspects to it. . . .").

■ However, once the suspect is in custody, questions that are reasonably

likely to elicit an incriminating response are not outside the bounds of *Miranda* merely because they were posed Co the defendant while still at the scene of the crime. Here, the police had already secured Guess and had begun to escort him to a police unit when they asked him if he had a vehicle at the scene. Even though the question might at first appear fairly innocuous, it was reasonably likely to elicit an incriminating response because his admission would allow the detectives to link to the Defendant any drugs they suspected were in the vehicle. Since the Defendant was in custody at the time, and he was clearly the focus of a criminal investigation with an interest in the contents of his suspected on-sight vehicle, such questions find no shelter under the general on-the scene exception.

### 4. Public Safety Exception

█ The Government next contends that there is a public safety exception that permits law enforcement to pose unwarned questions to a suspect at the scene of an arrest if the questions regard weapons, drug use or other matters relevant to the safety of the officers and members of the public. In support of this exception, the Government cites *New York v. Quarles.* In *New York v. Quarles,* the United States Supreme Court carved out a public safety exception to the *Miranda* rule. In that case, a young woman told police officers that she had just been raped by a man with a gun, who ran into a supermarket after the attack. *New York v. Quarles,* 467 U.S. 649, 651–52, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). When an officer found the suspect in the market, the officer asked him for the location of the gun prior to reciting any *Miranda* warnings. *Id.* at 652, 104 S.Ct. 2626. On the issue of whether the defendant's response to the

officer should be suppressed because it was obtained in violation of *Miranda,* the Supreme Court held "that on these faces there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Id.* at 655, 104 S.Ct. 2626. The gun "obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id.* at 657, 104 S.Ct. 2626. "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* Consequently, the public safety exception applied in that context. However, the Court counseled that the exception does not apply to "questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 659, 104 S.Ct. 2626.

█ In *United States v. Mobley,* the Fourth Circuit addressed the intricacies of the public safety exception. There, it stated that "[a]s an exception, it must be construed narrowly." *United States v. Mobley,* 40 F.3d 688, 693 (4th Cir.1994). "[T]he 'public safety' exception applies only where there is 'an objectively-reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *Id.* (quoting *Quarles,* 467 U.S. at 659 n. 8, 104 S.Ct. 2626). "Absent such circumstances posing an objective danger to the public or police, the need for the exception is not apparent, and the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety motivated the questioning that all understand is otherwise improper."[7] *Id.* at 693.

---

**7.** In a footnote, the *Mobley* court notes that even when questioning people on narcotics

■ Cases applying the public safety exception in this Circuit reflect that the public safety exception is a narrow exception to *Miranda* that typically applies when the public or officers face an *immediate* danger associated with a weapon. *See, e.g., United States v. Martin,* No. 2:06–0226, 2007 WL 773907, at *3, 2007 U.S. Dist. LEXIS 17012, at *8–*9 (S.D.W.Va. Mar. 9, 2007); *United States v. Tyson,* 360 F.Supp.2d 798, 809 n. 14 (E.D.Va.2005); *United States v. Reynolds,* 334 F.Supp.2d 909, 913 (W.D.Va.2004). In the Government's brief, its sole justification for invoking the public safety exception is that the "truck was a safety hazard if left unattended after the arrest of the defendant" and the "detective had a duty to locate and remove the vehicle from public streets to protect the public and other officers and keep it away from co-conspirators and preserve the highly movable vehicle for seizure." Without more, these reasons are insufficient to invoke what is a narrow exception to *Miranda.* Although the Defendant had a weapon on his person, there is no evidence that the officers feared there were additional firearms in the truck. Nor do they assert that they were concerned that the public or co-conspirators had immediate access to the truck. In fact, testimony at the hearing suggested that it was necessary to use the Defendant's key to access the truck. As a result, the public safety exception is inapplicable on these facts.

Since the suspect was in custody when he was interrogated, and since none of the exceptions to *Miranda* offered by the Government apply, the Defendant's statement, that the white pickup truck parked in front of the building belonged to him, must be suppressed.

### B. Statements Regarding Consent to Search the Vehicle

While the main issue addressed during the suppression hearing dealt with whether the Court should suppress the Defendant's statement that the white pickup truck belonged to him, the discussion naturally led to the question of whether the Court should admit the Defendant's refusal to consent to a search of that same vehicle. According to the Government, requesting consent to search is not interrogation for *Miranda* purposes and thus the question, and the Defendant's answer, should be admitted. On the other hand, Defense counsel contended that the Defendant's refusal to consent to a search of his vehicle should be inadmissible because he has a right to refuse consent under the Fourth Amendment, and he should not be penalized for asserting that right. Both arguments appear to have merit. As evidenced by the arguments of counsel, this question of admissibility implicates both the Fourth and Fifth Amendments to the United States Constitution.

### 1. Applicability of Miranda

■ As mentioned previously, in order for *Miranda's* protections to apply to questioning posed by the government to a suspect, the suspect must be subject to custodial interrogation. In turn, a question posed while a suspect is in police custody only amounts to interrogation for *Miranda* purposes if it is reasonably likely to elicit an incriminating response. *See infra* Part II.A.1.a. The Government is

---

charges,

> [a]bsent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to police or public;

> each case must be examined on its own facts to determine whether the deviation from the standard rule is justified by the totality of the circumstances in which the questioning takes place.

*Mobley,* 40 F.3d at 693 n. 2.

correct in its assertion that an officer asking for consent to search is generally not engaged in interrogation for *Miranda* purposes. In *United States v. Stevens*, for example, the Fifth Circuit held that "[t]he failure of officials to give *Miranda* warnings before asking for consent does not prohibit the use of a defendant's in-custody statements granting consent to a search." *United States v. Stevens*, 487 F.3d 232, 242–43 (5th Cir.2007). This conclusion was based in part on the fact that a law enforcement officer's request that a suspect consent to a search is not likely to elicit an incriminating response. *Id.* at 243. As a result, the request for consent was not interrogation and *Miranda* did not apply. *See also United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir.1994) ("An officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's Miranda rights."); *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993) ("[A] consent to search is not a selfincriminating [sic] statement and, therefore, a request to search does not amount to interrogation.").

▇▇▇ While it is true that the evidence discovered during a search resulting from an unwarned statement might lead to evidence that incriminates a defendant, the Fifth Amendment's core protection "is a prohibition on compelling a criminal defendant to testify against himself at trial," not the suppression of all incriminating evidence that may follow from a suspect's statement. *See United States v. Patane*, 542 U.S. 630, 637–38, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). *See also Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.1985) (internal citations omitted) ("Simply put, a consent to search is not an incriminating statement.... [I]n and of itself, [the consent] is not evidence which tends to incriminate [a suspect]. While the search taken pursuant to that consent disclosed

incriminating evidence, this evidence is real and physical, not testimonial."). Therefore, even if incriminating evidence is obtained as a result of a consensual search, that does not mean that the request for consent is interrogation under *Miranda*. Consequently, if the request for consent and the consenting response are not interrogation, the suspect's refusal to consent similarly need not be suppressed on the grounds that it was obtained in violation of *Miranda*. While the introduction of the statements does not offend the Fifth Amendment, the Court must also analyze whether the Fourth Amendment creates an alternative ground for suppression.

### 2. Applicability of the Fourth Amendment

▇▇▇ The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. In interpreting the Fourth Amendment, the Supreme Court has stated that "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). However, "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.*

▇▇▇ When faced with a request to search his personal effects, a suspect may

voluntarily grant consent, or as the Defendant did in the present case, refuse to allow the search. In most cases where the defendant requests that the court suppress his consent to search his personal effects, he is also seeking suppression of the incriminating physical fruits obtained as a result of the allegedly tainted consent search. This case does not fit into that typical paradigm. Here, the Defendant refused to give law enforcement officials consent to search the vehicle. As a result, the Government is not relying on a consent search for the admission of physical fruits. Therefore, there must be an alternative reason for introducing the Defendant's refusal to grant consent. Although, during the suppression hearing, the Government did not state the reasons why it would be interested in introducing the Defendant's refusal to consent to a search of his vehicle, two plausible explanations spring to mind.

First, it is conceivable that Defendant's refusal to consent to a search of the pickup truck could be introduced to show his ownership of the pickup truck. One might expect a person who did not own a vehicle to state that fact when asked by law enforcement if they may search that vehicle. The Defendant's failure to make such a denial of ownership could lead a fact finder to conclude that the Defendant was impliedly admitting to owning the truck. However, using the refusal of consent in such a way would be an impermissible end run around the requirements of *Miranda*. As discussed above, the Court has concluded that the Defendant's response to Detective Marcus' question regarding whether he had a vehicle must be suppressed because the question was reasonably likely to lead to an incriminating response on these specific facts, and it was posed to the Defendant without the benefit of *Miranda* warnings. If the Court were then to allow the introduction of the Defendant's subsequent refusal of consent to be introduced as a implicit admission of ownership of the vehicle, it would render the suppression of the previous statement moot. Introduction of such an unwarned statement would offend *Miranda's* core purpose—namely, preventing law enforcement from compelling a criminal defendant to testify against himself at trial.

 Another potential reason for introducing the Defendant's refusal of consent would be to show consciousness of guilt—to show that the Defendant knew he had something to hide, and therefore did not want law enforcement looking in his pickup truck. Although introduction of the statement for that purpose might not offend *Miranda*, it does compromise a citizen's protections under the Fourth Amendment. While law enforcement generally requires a warrant to conduct searches under the Fourth Amendment, one such exception to that rule applies when the suspect gives law enforcement voluntary consent to search an area of interest. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("The Fourth Amendment test for a valid consent to search is that the consent be voluntary. . . .") If consent is to be truly voluntary, a defendant must have the option to either grant consent, or as the Defendant did in the present case, refuse to allow the search with no negative evidentiary impact.

 If the Government was allowed to admit a suspect's refusal of consent in order to show consciousness of guilt, a defendant's consent could never be truly voluntary. In such an instance, the defendant would be faced with a "Hobson's choice." He could either consent to a search of his vehicle and relieve the Government from getting a warrant, a key procedural safeguard against unreasonable

searches, or he could assert his constitutional right by refusing to grant consent, and have that refusal incriminate him by implication. Admitting such a statement would punish a person for asserting a constitutional right. *See e.g., United States v. Thame*, 846 F.2d 200, 207 (3d Cir.1988) ("Thus, in our view, it was error for the prosecutor to argue that Thame's reliance on his fourth amendment rights constituted evidence of his guilt."); *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) ("[P]assive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing. If the Government could use such a refusal against the citizen, an unfair and impermissible burden would be placed upon the assertion of a constitutional right and future consents would not be "freely and voluntarily given." "); *Mackey v. State*, 234 Ga.App. 554, 507 S.E.2d 482, 484 (Ga.Ct.App.1998); *Simmons v. State*, 308 S.C. 481, 419 S.E.2d 225, 226–27 (1992); *Padgett v. State*, 590 P.2d 432, 434 (Alaska 1979). *See also United States v. McNatt*, 931 F.2d 251, 256–58 (4th Cir.1991) (discussing the fact that there are unique situations where the government may comment on a defendant's refusal to grant consent to search, which leads to the inference that as a general rule, such a comment by the government is ordinarily impermissible). Therefore, once a defendant invokes his right to refuse consent, the prosecution may not seek to draw an adverse inference from such invocation unless the defendant uses such protection as a sword, rather than a shield.

The Fourth Circuit Court of Appeals recognized this exception in *United States v. McNatt. McNatt*, 931 F.2d at 256–58. In *McNatt*, the defendant was pulled over while driving his pickup truck and placed under arrest based on an outstanding arrest warrant. *Id.* at 253. At the scene, he denied the officer's request to search his vehicle. *Id.* However, when law enforcement officers later searched the truck in the impound lot, they found a kilogram of cocaine in the vehicle, which led to a charge of possession with intent to distribute. *Id.* During the trial, the defendant claimed that one of the arresting officers planted the cocaine in his vehicle. *Id.* at 256. However, when prosecutors attempted to rebut this assertion by arguing that the defendant had denied the arresting officer permission to search his vehicle, the defendant claimed that it would be a violation of due process for the prosecution to introduce his refusal against him. *Id.* The Court held that it is permissible for the government to refer to the defendant's refusal to grant consent to a search where the defendant puts the credibility of the officer conducting the search at issue. *Id.* at 256–58. "The government did not argue that appellant's refusal supported an inference of guilt, but only that it was inconsistent with the claim that the evidence had been planted." *Id.* at 257. Since the prosecutor's statement "was not an unfair penalty for defendant's asserting a constitutional privilege," admitting the refusal to consent did not compromise the defendant's constitutional rights. *See also United States v. Tucker*, 30 Fed.Appx. 45, 47 (4th Cir.2002). However, this is a limited exception that cannot be used by the government until a defendant has opened the door. *Thame*, 846 F.2d at 206–07 (stating that the government's comment on defendant's assertion of his Fourth Amendment rights "cannot be justified as an invited reply since the prosecutor raised the argument first.").

With these principles in mind, determination of this issue must await trial as the Court cannot at this point foresee the exact context in which this issue may arise.

## *CONCLUSION*

In the Defendant's Motion, he has asked this Court to suppress evidence that falls into three separate categories—statements made at the time he was initially arrested, physical evidence that law enforcement discovered in his white pickup truck, and statements he made to Detective Marcus during an interrogation at the Norfolk City Jail. During the suppression hearing, the parties narrowed the number of contested issues to two—whether the Court should suppress unwarned statements the Defendant made regarding ownership of a pickup truck located at the scene and whether the Court should suppress the Defendant's refusal to consent to a search of that truck. As to the statements regarding ownership of the truck, the Court finds that those statements should the suppressed because Defendant did not receive *Miranda* warnings, the statements were made during custodial interrogation, and no exceptions to *Miranda* apply. Because the Court does not at this point know how the consent issue will arise at trial, a ruling on the admissibility of the Defendant's refusal to consent to a search of the pickup truck must await trial. For the foregoing reasons, the Court hereby **GRANTS IN PART** Defendant's Motion to Suppress, a takes the consent issue under advisement pending trial.

The Clerk is **DIRECTED** to send a copy of this Order to a counsel of record.

**IT IS SO ORDERED.**