**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant,*

v.                                              No. 07-4101

ERIC JAMISON,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(1:06-cr-00304-AMD)

Argued: September 28, 2007

Decided: December 4, 2007

Before NIEMEYER and DUNCAN, Circuit Judges,
and T. S. ELLIS, III, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Duncan wrote
the opinion, in which Judge Niemeyer and Senior Judge Ellis con-
curred.

_____

## COUNSEL

**ARGUED:** Lori Ann Leonovicz, Special Assistant United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Balti-
more, Maryland, for Appellant. Paresh S. Patel, OFFICE OF THE
FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appel-

lee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Steven H. Levin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant. James Wyda, Federal Public Defender, Baltimore, Maryland, Joseph Balter, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

This appeal presents the question of whether a defendant subjected to police questioning in a hospital emergency room after he sought treatment for a gunshot wound was "in custody," triggering the protections of *Miranda v. Arizona*, 384 U.S. 436, 441 (1966). The defendant, Eric Jamison ("Jamison"), solicited police assistance upon arriving at the hospital, telling an officer stationed at the entrance, "I've been shot[!]" J.A. 70. Jamison's exclamation invited a later police interview in his hospital bed, during which Jamison ultimately revealed that he had in fact shot himself. Jamison's admission formed the basis of, inter alia, a charge for possession of a firearm by a felon, 18 U.S.C. § 922(g)(1).

Finding that the police had subjected Jamison to a "police-dominated environment . . . from the moment he entered the treatment room," J.A. 334-35, the district court held that Jamison was in custody during the police questioning. The district court therefore suppressed Jamison's admission that he had shot himself and his other descriptions of the shooting, citing *Miranda*. On appeal, we find that Jamison's freedom to terminate the interview was curtailed primarily by circumstances resulting from his injury and hospital admittance rather than by police restraint. We therefore hold that Jamison was not in custody at the time of his questioning and that *Miranda* warnings were not required. We reverse the district court's order suppressing Jamison's statements and remand for further proceedings.

## I.

The essential facts are undisputed. At some point after midnight on January 17, 2006, Jamison accidentally shot himself near the groin. Michael McClenon ("McClenon") and Charles Moore ("Moore") drove him to the emergency room at the University of Maryland Hospital where three on-duty police officers, congregated at the hospital entrance, saw them arrive. McClenon and Moore exited the vehicle and told the officers that a gunshot victim was in the back seat. When the officers opened the back door to the car, Jamison called out, "C.O., C.O., I've been shot, man, I've been shot."[1] J.A. 70 (internal punctuation altered).

Officer Maurice Avance ("Officer Avance"), one of the officers approached by McClenon and Moore, had been posted that evening at the "security registration desk" near the hospital entrance. He solicited Jamison's name and the geographic location of the shooting as hospital staff escorted Jamison to a treatment room. Officer Avance called the police dispatch coordinator, reported the shooting, and requested a detective be sent to the hospital to investigate. Officer Avance then followed Jamison to his room, where he was lying prone on a gurney while attending nurses cut off his clothing.

Hospital staff identified an entrance wound near Jamison's groin and an exit wound on his outer thigh. They began tending to the wounds and inserted an I.V. line into Jamison's arm. As Jamison's treatment continued, Officer Avance asked him to recount what had happened. Jamison initially stated that he was attempting to buy drugs on a certain street corner when an unknown person shot him. He said he then flagged down a car with two men in it and they drove him to the emergency room.

Shortly after Jamison was placed in the treatment room, Officer Avance requested that brown bags be placed over Jamison's hands. The record is unclear as to whether hospital staff or Officer Avance actually affixed the bags. Officer Avance later testified that officers investigating a shooting routinely order that a gunshot-residue test be

---

[1]Officer Avance testified that "C.O." is an abbreviation for "Corrections Officer" commonly used among prison populations. J.A. 70.

performed on the hands of the wounded, regardless of whether he is thought to be a victim or a suspect in the shooting. To ensure the integrity of the test, plastic or paper bags are customarily placed over the hands of the person to be tested, reducing the possibility of contamination.

Officer Avance left Jamison's treatment room after Jamison's hands were bagged, contacting the dispatch coordinator again and requesting a gunshot-residue test for Jamison. He then returned to Jamison's room. Detective Sergeant Clifton Macer ("Detective Macer"), a nonfatal-shootings investigator weighing 280 pounds and standing six feet, four inches tall, responded to the dispatch coordinator's call and arrived in Jamison's room. Officer Avance met Detective Macer in the hallway and briefed him on what had occurred. The officers returned to Jamison's room, where Detective Macer asked Jamison to describe how he came to be shot. This time, Jamison said he was using drugs (rather than buying them, as he had claimed earlier) on a different street corner when someone attempted to rob and then shot him. Recognizing these discrepancies, Detective Macer asked Jamison once again to describe the shooting, and Jamison confirmed his second account.

Without securing Jamison's consent, Detective Macer examined Jamison's injury, partially exposing his genitalia. He found charring and stippling[2] at the entry wound consistent with a shot fired at close range. He further observed a downward trajectory from the entry wound to the exit wound. Finding these facts to be in tension with Jamison's account of the shooting, Detective Macer then examined Jamison's clothing and found no bullet holes. Detective Macer again asked Jamison to explain the shooting; Jamison repeated that he was shot while using drugs. When Detective Macer explained that his observations seemed inconsistent with Jamison's story, Jamison admitted that he shot himself with a handgun and threw the gun away. Detective Macer asked Jamison to reveal the location of the gun so that it could be secured, but Jamison refused, explaining that he was

---

[2]"Stippling" describes the presence of burned and unburned gun powder that sticks to the target when a gun is fired at close range. *See Goins v. Angelone*, 226 F.3d 312, 316 (4th Cir. 2000).

on probation. Detective Macer's entire conversation with Jamison lasted approximately twenty minutes.

A crime-lab technician arrived while Detective Macer was interviewing Jamison. At Detective Macer's direction, the technician took a photograph of Jamison lying on the gurney, close-ups of the entry and exit wounds, and a photograph of each removed item of Jamison's clothing. It is unclear on the record whether the photographs were taken before or after Jamison admitted that he shot himself.

After interviewing Jamison, Detective Macer left the room to find McClenon and Moore, who were waiting elsewhere in the hospital. Meanwhile, the crime-lab technician remained in Jamison's room and collected samples from his hands for the gunshot-residue test. She also collected Jamison's clothes, preserving them as evidence. She then left the hospital, having been in Jamison's room for about forty minutes.

When Detective Macer located McClenon and Moore and began interviewing them, the two denied knowing Jamison. Coincidentally, a University of Maryland police officer approached the trio at that moment, informing Detective Macer that a handgun had been found in the hospital's vending-machine area. Hearing this, McClenon and Moore admitted to driving Jamison to the hospital and then disposing of the gun in the vending-machine area.[3]

A few hours after conducting the interviews of Jamison, McClenon and Moore, Detective Macer returned to the station house, researched Jamison's record, and learned that he was a convicted felon. Detective Macer swore out a warrant for Jamison's arrest. A federal grand jury indicted Jamison seven months later for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

---

[3]The parties dispute whether, after retrieving the gun, Detective Macer returned to question Jamison further. Jamison contends that Detective Macer confronted him with the gun to confirm whether it was the same weapon that inflicted Jamison's wounds. These events occurred, if at all, well after Jamison made the series of statements, variously describing the shooting, that form the basis of this appeal. Thus, our disposition does not depend on resolution of the parties' dispute as to Detective Macer's later actions.

Before his trial, Jamison filed a motion to suppress "any and all statements, admissions and confessions" he made during the interviews that evening with Officer Avance and Detective Macer. At the subsequent suppression hearing, the district court, relying on *United States v. Conley*, 779 F.2d 970 (4th Cir. 1985), compared the limitations on Jamison's freedom to those suffered by the typical emergency room patient, concluding that such a patient would not be "subjected to what Mr. Jamison clearly indisputably was subjected to in this case," J.A. 331. In particular, the court reasoned that the imposing stature of the primary investigator, Detective Macer, and supposed inconsistencies in his testimony as to whether he returned to Jamison's room after recovering the gun, gave rise to an inference by "[c]ommon sense" that Detective Macer's questioning had been "aggressive." J.A. 332. Furthermore, the court found that the two officers treated Jamison's body and clothing as "a crime scene," inspecting both for evidence relating to the shooting, and further restraining Jamison's freedom of movement by handling his body for photographs and bagging his hands for a gunshot-residue test. J.A. 335. In short, the court reasoned that the officers subjected Jamison "to a police-dominated environment . . . from the moment he entered the treatment room." J.A. 334-35. In light of these restrictions on Jamison's freedom, the court concluded that Jamison was in custody during the interview, requiring the suppression of Jamison's accounts of the shooting.[4] The government now appeals the suppression order pursuant to 18 U.S.C. § 3731.

II.

In considering an appeal of a suppression order, "[w]e review the district court's factual findings for clear error and its legal determinations de novo." *United States v. Jarrett*, 338 F.3d 339, 343-44 (4th Cir. 2003). We view the facts in the light most favorable to the prevailing party below. *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003).

---

[4]Jamison also filed a motion to suppress the tangible evidence that might be used against him at trial, including his clothing and the gun. The district court denied the motion, and Jamison does not appeal the denial.

## A.

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege against self-incrimination is not limited to statements made during criminal court proceedings; rather, it attaches whenever a person is in custody and subject to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[5] *Id.* at 444. Thus, during the course of a criminal trial, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.*

The question of custody typically turns on whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). In some circumstances, however, the defendant may be prevented from pretermitting the interrogation because of factors independent of police restraint. For example, in *Florida v. Bostick*, the defendant's "freedom of movement was restricted by a factor independent of police conduct—i.e., by his being a passenger on a bus"—which rendered the standard "free to leave" analysis inapplicable. 501 U.S. 429, 436 (1991) (emphasis omitted). In such circumstances, "the appropriate inquiry is whether a reasonable person would feel free to decline officers' requests or otherwise terminate the encounter." *Id.* at 436.

This court came to a similar conclusion in *United States v. Conley*, 779 F.2d 970 (4th Cir. 1985), a case decided before *Bostick*. In *Conley*, the defendant, an inmate, was injured in a stabbing incident. *Id.* at 971. He was interrogated both before and after receiving medical

---

[5]The district court found that, as a rule, "interrogation is questioning." J.A. 66. To the contrary, interrogation is more aptly defined as "questioning initiated *by law enforcement officers*." *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007) (internal quotations omitted).

treatment at the prison's infirmary, but never received *Miranda* warnings. The defendant made statements intended to exculpate him in a murder investigation arising from the stabbing incident. When the statements were later used against him at trial, he attempted to have the statements suppressed, unsuccessfully arguing they were made while he was in custody. *Id.* This court recognized that "restraint" can be a relative concept. When, "by definition, the entire population [of inmates] is under restraint of free movement," a person cannot be deemed to be in custody unless a reasonable person would perceive that the police have imposed *additional* restraints on his freedom of action. *Id.* at 973; *see also Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978) (recognizing that restriction in a defendant-inmate scenario is a relative concept which "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement").

Applying this insight, the *Conley* court examined the totality of the circumstances in which the defendant's questioning occurred, seeking to identify whether the restraints on the defendant were incident to his interrogation or were merely background limitations imposed on all prisoners in his situation. 779 F.2d at 973. The primary purpose for which the defendant was taken to the conference room was not to interrogate him but to separate him from other inmates and allow him to be safely transported to the infirmary. Indeed, the discussions were brief and were interrupted by Conley's trip to the infirmary. *Id.* at 973 n.4. Though Conley wore handcuffs, such was standard procedure for transferring inmates within the prison. *Id.* at 973-74. Finally, the officers called Conley by name and treated him as a witness, not as a suspect. *Id.* at 974. In light of these circumstances, the court held that Conley's freedom was no more restricted than that of other prisoners undergoing transfer within the facility, and *Miranda* warnings were not required. *Id.*

Against this legal backdrop, we now consider the peculiar circumstances surrounding Jamison's questioning.

### B.

Analysis of whether Jamison was in custody when he made the statements describing the shooting depends on "whether a reasonable

person would [have] fe[lt] free to decline the officers' requests or otherwise terminate the encounter," *Bostick*, 501 U.S. at 436. In dissecting the perceptions of such a reasonable person, however, we must be careful to separate the restrictions on his freedom arising from police interrogation and those incident to his background circumstances. That is, to the extent Jamison felt constrained by his injuries, the medical exigencies they created (e.g., the donning of a hospital gown and the insertion of an I.V. line), or the routine police investigation they initiated, such limitations on his freedom should not factor into our reasonable-person analysis. It is this careful differentiation between police-imposed restraint and circumstantial restraint that leads us to conclude that Jamison was not in custody when he described the shooting during his hospital interview. The district court properly invoked the same lodestar, but proceeded to classify the significant limitations on Jamison's freedom as police-imposed when they were actually routine treatment for a person in Jamison's position.

1.

Jamison relies heavily on the affixing of paper bags to his hands as evidence that he was in custody. Jamison argues that "[t]he bags effectively paralyzed his hands" and were thus "[e]ven worse than handcuffs." Appellee's Br. at 22. Jamison questions whether paper bags were indeed applied to shooting victims' hands as a matter of standard practice, citing Detective Macer's testimony at the suppression hearing that the investigating officer has discretion as to whether to order a gunshot-residue test. Jamison also argues that, since the record does not reveal whether the officers explained the purpose of the bags to him, a reasonable person would have inferred that the bags rendered him effectively under arrest and not free to terminate the encounter with the police.

Jamison's characterization of the use of the bags as discretionary is inaccurate. First, Detective Macer's testimony at the suppression hearing explained that bags are generally affixed to the hands of *all* shooting victims—suspects or not—soon after police arrive at the crime scene or the hospital. The portion of Detective Macer's testimony cited by Jamison pertains instead to the actions of the police *after* the bags are affixed. Detective Macer clarified that, depending on further developments in the investigation, a victim's hands are

either tested for gunshot residue, or, "[i]f it's determined that it's not needed, then the bags are removed and the test is not conducted." J.A. 265. That is, the victim's hands are initially bagged as a matter of course, but the decision to follow through with the gunshot-residue test is "a judgment call . . . [b]ased on [the] investigation." *Id.*[6]

This distinction is critical here, because the samples for Jamison's gunshot-residue test were not taken until *after* he provided his conflicting accounts of the shooting and *after* he admitted to shooting himself—the very statements sought to be suppressed. Whether Jamison was in custody while the technician took samples from his hands (*after* he provided the statements regarding the shooting) is logically inapposite to the question on appeal.[7] We find nothing in the record, then, to suggest that bags were not placed on the hands of all shooting victims, including Jamison, as a matter of standard practice.

---

[6]The district court made a factual finding that one of the two officers, not hospital staff, had affixed the bags to Jamison's hands. The finding was based solely on the court's determination that Detective Macer's testimony regarding his actions *after* locating the gun was impeached on cross-examination. Because there is nothing in the record to support the finding that the officers physically affixed the bags, we hold such finding to be clearly erroneous and do not accord it any weight on appeal. *See Jarrett*, 338 F.3d at 344.

[7]For this reason, we find no merit in Jamison's analogies to *United States v. Turner*, 761 A.2d 845 (D.C. 2000), and *State v. Louis*, 727 P.2d 483 (Kan. 1986). In *Turner*, the police collected hair, saliva, and blood samples first, then proceeded to question the defendant. The court found that the taking of the samples had placed the defendant in custody, where he remained during his subsequent questioning. *See* 761 A.2d at 852 (suppressing the defendant's statements because he had not received *Miranda* warnings); *see also Louis*, 727 P.2d at 489 (holding that the taking of blood samples from a defendant in the hospital after a vehicular homicide, during which time officers were instructed to stand guard and not allow the defendant to leave, rendered the defendant in custody). Of course, whether Jamison was in custody at the times the test was conducted and the clothes were confiscated might have been relevant to Jamison's motion to suppress the tangible evidence. Because Jamison did not appeal the denial of the motion to suppress the tangible evidence, we decline to discuss it further.

Jamison's insistence that a reasonable person would believe the bags rendered him effectively under arrest is likewise unavailing. Of course, a reasonable person without a detailed knowledge of police procedures might find it odd that his hands were bagged as soon as he arrived at the hospital for treatment for a gunshot wound. The likelihood of such curiosity does not, however, lead to an inference that a reasonable person would consequently feel unable to refuse police questioning. To the contrary, a reasonable person would feel free to inquire as to why the bags were employed and whether he could refuse them or further questioning. We therefore conclude that the affixing of the bags to Jamison's hands does not alone render his questioning custodial.

2.

The affixing of bags to his hands forms only part of Jamison's broader contention that the police treated him as a suspect, and not as a victim, from the moment he entered the hospital. In particular, Jamison objects to the officers' treatment of his body and clothing as a crime scene. The district court found merit in Jamison's argument, finding that "[t]here is no such thing as a crime scene exception to the [C]onstitution." J.A. 336.

Jamison, and the court below, however, misunderstand the reach of *Miranda*.

> General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Miranda*, 384 U.S. at 477-78. Granted, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Matthiason*, 429 U.S. 492, 495

(1977). But *Miranda* and its progeny do not equate police investigation of criminal acts with police coercion. This distinction is especially salient when the victim or suspect initiates the encounter with the police. *Cf. Kimbrough*, 477 F.3d at 146-47 (holding that questioning by the defendant's mother was not initiated by law enforcement officers and therefore the defendant was not in custody during the questioning).

Many of the indignities suffered by Jamison at the hands of the police during his hospital stay were the direct result of his seeking medical treatment and initiating a police investigation. Before any officer had an opportunity to question Jamison, he called out for their assistance, "C.O., C.O., I've been shot, man, I've been shot." J.A. 70 (internal punctuation altered). Having invoked the protective and investigatory powers of the police, a reasonable person in Jamison's position would not then be surprised when asked to recount a description of the shooting. Given the violent nature of the crime and the fact that Jamison's very injuries and explanations constituted key evidence, a reasonable person would expect to be interviewed even while receiving urgent medical care. Indeed, a reasonable person might complain of police malfeasance had they *not* immediately investigated the shooting. In the context of this investigation, even the most significant limitation on Jamison's freedom, the bagging of his hands, seems less intrusive. A reasonable person would not feel deprived of his freedom by the neutral application of such a blanket policy to victims and suspects.

As Jamison's questioning progressed and his accounts began to reveal inconsistencies, a reasonable person would expect diligent investigators to ask for clarification. Furthermore, a reasonable person would not be surprised to have the police investigate and even photograph the gunshot wound,[8] perhaps to identify the caliber of weapon the assailant used on the victim and the trajectory of the bullet. Of course, investigation of the wound involved officers coming into physical contact with Jamison, even partially exposing Jamison's gen-

---

[8]As mentioned *supra*, we cannot determine on the record whether the photographs were taken before or after Jamison's admission that he shot himself. In any event, we find the photographs to have been taken as a neutral investigatory tool.

italia. This affront to Jamison's privacy was, however, the direct result of Jamison having shot himself near the groin. Finally, after providing shifting explanations of where in the city the shooting occurred, a reasonable person would expect the police to question him further, lest they expend energy investigating false leads.

Viewed in this light, the actions of Detective Macer reflect the prudent course of conduct a reasonable person might expect after initiating a police investigation into his shooting. A reasonable person would tolerate nothing less than a thorough investigation into such a shooting. The district court's contrary characterization of Detective Macer's questioning as "aggressive" therefore cannot withstand scrutiny.[9]

We find *Mosely v. State*, 495 S.E.2d 9 (Ga. 1998), cited by the government, illustrative. In *Mosely*, the defendant drove his unconscious wife to the hospital. His wife had been shot at close range with a shotgun and the defendant had a shotgun wound to his leg. Investigators arrived at the hospital and spoke with the defendant regarding the shootings, who recounted a story of armed robbery. Though investigators did not immediately consider the defendant a suspect, they subjected him to a gunshot-residue test as a matter of routine procedure. The test results and the defendant's shifting explanations to investigators suggested that the defendant had shot his wife and himself. At his subsequent murder trial, the defendant moved to suppress the statements he made to investigators. The court held that the defendant was "merely being questioned as a victim" and was therefore not in police custody while he was being treated in the emergency room. *Id.* at 12. Just as police investigation concurrent with emergency medical treatment was found non-custodial when the defendant in *Mosely* was treated as a mere victim, so too do we find Jamison's questioning to be precisely what would be expected were Jamison merely a victim.

---

[9]The district court noted that Detective Macer's imposing stature factored into its finding of custody. Because we conclude that Detective Macer's investigation would otherwise be found prudent by a reasonable person, we find that his stature alone does not render his questioning of Jamison custodial.

Jamison was primarily restrained not by the might of the police, but by his self-inflicted gunshot wound, the medical exigencies it created, and the investigation he initiated. We therefore conclude that a reasonable person in Jamison's circumstances would not have found himself restrained by the police. Instead, he would have "fe[lt] free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436-37. We therefore hold that Jamison was not in custody at the time he offered the statements describing the shooting, including his admission that he shot himself.

3.

Comparison to similar cases bolsters our conclusion. For example, we find the circumstances surrounding Jamison's questioning to parallel those circumstances found to be non-custodial in *Conley*, this court's seminal case exploring the distinction between background restraint and police restraint. For example, Jamison's conversation with the police was incident to his seeking medical treatment for his gunshot wounds, just as the inmate in *Conley* spoke to officials only in connection with being transported to the prison infirmary to receive treatment for stab wounds. *See* 779 F.2d at 971. Furthermore, brown bags are used with victims, witnesses, and suspects alike, paralleling the blanket use of handcuffs in a prison setting that was found to be a background circumstance in *Conley. Id.* at 973-74. Finally, only forty minutes elapsed, at most, from the time Jamison's friends dropped him off at the emergency department to the time when Jamison confessed to shooting himself, just as the *Conley* inmate had only brief discussions with investigators.[10] *Id.* at 974 n.4.

---

[10]The government notes that the other courts that have considered police interviews in a hospital setting have reached a similar result. *See United States v. Robertson*, 19 F.3d 1318, 1320-21 (10th Cir. 1994) (finding defendant was not in custody even though he was interviewed by law enforcement while he was hospitalized with a head injury); *United States v. Martin*, 781 F.2d 671, 674 (9th Cir. 1986) (finding that a defendant, groggy from the effects of Demerol, who spoke with detectives in his hospital room was not in custody and therefore not entitled to *Miranda* warnings); *State v. Middleton*, 854 S.W.2d 504, 516 (Mo. Ct. App. 1993) (finding that a shooting suspect was not in custody during police questioning at his home in part because the officers' paraffin test of the defendant's hands, designed to detect gunshot residue, was part of routine police investigation into the shooting). We find the reasoning in these cases serves only to confirm our own.

At bottom, Jamison was certainly inconvenienced by the circumstances of his hospitalization. Trading one's street clothes for a gown, sacrificing one's privacy as countless nurses, nursing assistants, and physicians perform examinations, and suffering the insertion of an I.V. line into one's arm are all intrusions borne by those in need of urgent medical care. These circumstances served to compound the primary restriction on Jamison's freedom to leave: twin wounds from a bullet entering near his groin and exiting his outer thigh. The fact of Jamison's injury, the trappings of his treatment, and the routine aspects of the investigation he initiated provided the most substantial restrictions of Jamison's freedom of movement, far outstripping whatever additional impingement on his freedom to leave was presented by the officers during the ongoing police investigation into his shooting.

## III.

Absent police-imposed restraint, there is no custody. It was Jamison, not the police, who initiated the questioning at issue here when he told police at the hospital that he was the shooting victim of an unknown assailant. The police posed questions to Jamison and restricted his freedom of action, but only to the degree necessary to investigate the crime. Their activities did not transform Jamison's hospital interview into a custodial interrogation. As Jamison's statements were not made under custodial interrogation, *Miranda* warnings were not required, and the statements should not have been suppressed. We therefore reverse the suppression order of the district court and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*