**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 11-5181**

───────────

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

        v.

MICHAEL LAWRENCE WHITE, a/k/a Big Boy,

                    Defendant - Appellant.

───────────

**No. 12-4158**

───────────

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

        v.

VICTOR ANDRE THOMAS, a/k/a Flak, a/k/a Flat,

                    Defendant - Appellant.

───────────

Appeals from the United States District Court for the District
of Maryland, at Baltimore.  Richard D. Bennett, District Judge.
(1:10-cr-00491-RDB-12; 1:10-cr-00491-RDB-3)

───────────

Argued:  January 30, 2013          Decided:  April 3, 2013

───────────

Before MOTZ, KING, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Ruth J. Vernet, RUTH J. VERNET, ESQ., LLC, Rockville, Maryland; Gary Proctor, LAW OFFICES OF GARY E. PROCTOR, LLC, Baltimore, Maryland, for Appellants. Christopher John Romano, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2010, a Harford, Maryland, drug trafficking investigation yielded the arrests of Appellants Victor Thomas and Michael White.[1] Thomas and White were charged with conspiracy to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846, and possession with intent to distribute the same, in violation of 21 U.S.C. § 841(a)(1). Additionally, Thomas was charged with felony possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Following a four-day jury trial, Thomas and White were convicted on both the conspiracy charge and the drug charge; a hung jury resulted on Thomas's gun charge. Thomas and White now appeal their convictions on multiple grounds. Because we find their arguments lacking in merit, we affirm.

I.

Thomas and White put forth several challenges to the evidence introduced at trial. One of these issues they raised below; the others they did not. We review each alleged error in

---

[1] Twelve other individuals were also apprehended. Eleven of them pled guilty. The twelfth, Rochelle Stokes, was tried with Thomas and White but was acquitted via a Rule 29 motion for judgment of acquittal at the end of the government's case.

3

keeping with the preservation diligence, or lack thereof, that Thomas and White exercised.

A.

Thomas and White first allege that the district court erred in declining to suppress evidence retrieved via wiretap. We review the factual findings underlying a motion to suppress for clear error; the legal conclusions we review de novo. United States v. Cain, 524 F.3d 477, 481 (4th Cir. 2008). In every instance, we view the evidence in the light most favorable to the party that prevailed below—in this instance, the government. United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007).

The Harford County Narcotics Task Force (HCNTF) conducted the drug investigation leading to the apprehension of Thomas and White. As part of its efforts, the HCNTF obtained authorization to wiretap a cell phone number connected to Thomas. The HCNTF monitored this number from April 26, 2010, to May 5, 2010, and, during that time, intercepted nearly two thousand phone calls. Thomas and White maintain that the HCNTF's interceptions violated both federal law and attorney-client privilege.

Governmental wiretaps must comport with Title III of the Omnibus Crime Control and Safe Streets Act (Omnibus Act), 18 U.S.C. § 2510-2522, a statute that attempts to balance individuals' right to privacy against the beneficial inroads

4

that electronic monitoring can provide in fighting crime, United States v. Clerkley, 556 F.2d 709, 712 (4th Cir. 1977).  Relevant to this case, the Act requires the government to minimize its interceptions where possible to avoid monitoring communications that are nongermane to a suspected offense.  18 U.S.C. § 2518(5) ("Every order [authorizing a wiretap] . . . shall be executed as soon as practicable, [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . .").

Thomas and White assert that the HCNTF violated the Omnibus Act by failing to minimize any of its interceptions on Thomas's phone.  They also aver that because one of the intercepted calls was placed to an attorney, the HCNTF violated attorney-client privilege.  Notably, Thomas did not speak with the attorney during the call that Thomas and White reference; he left a voicemail message in which he simply inquired about a court date for a civil case and asked the attorney to return his call. When Thomas asked the attorney to return his call, however, he provided a phone number different from the number that the HCNTF was monitoring.

Based on these alleged violations, Thomas and White moved pre-trial to suppress all evidence "derived from" the wiretaps. The district court denied the motion, concluding that the wiretap on Thomas's phone lacked "any minimization issues."

5

1.

We think it pertinent to note at the outset that the government has not clearly indicated whether the HCNTF indeed minimized any of its interception on Thomas's phone. In responding to pre-trial motions, the government simply maintained that given the nature of the investigation, the HCNTF's interceptions comported with the minimization requirement of the Omnibus Act. Furthermore, at the pre-trial motions hearing, when the court queried the government, it again responded in a manner that lacked any firm indication of minimization:

> I'm not in a position to advise the court at this point. I asked the detective were in fact calls minimized and his response to me was there may be calls where portions of them were minimized. I can't speak with any more specificity than that. There were calls I don't think were minimized in their entirety. There may have very well have been calls that were minimized in part.

The government's brief here is no more enlightening. In fact, it noticeably lacks any delineation of minimization efforts or explicit denial of Thomas and White's allegation that "out of thousands of calls not one was minimized."

We are not unaware of the statutory framework that exists for addressing alleged violations of the Omnibus Act. See 18 U.S.C. § 3504(a)(1) (providing that when an aggrieved party alleges that "evidence is inadmissible because it is the primary

6

product of an unlawful act [under the Omnibus Act] or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act"); United States v. Apple, 915 F.2d 899, 905 (4th Cir. 1990) (recognizing that if allegations brought under § 3504(a)(1) lack specificity, the government can respond with a general denial). Because Thomas and White have not contested the adequacy of the government's response, however, we decline to rule on whether such response was sufficient as a matter of law. Rather, we simply document the government's persistent equivocation on this point and note that it forces us to proceed, for the sake of argument only, on the assumption that Thomas and White's allegation of zero minimization is true. Even assuming the truth of this allegation, however, we find no error in the admission of the wiretap evidence.

a.

Assessing governmental compliance with the minimization mandate of the Omnibus Act is not a formulaic process. Reasonableness is the overarching standard, but the facts of each case heavily impact a determination of whether the government's behavior was in fact "reasonable." Clerkley, 556 F.2d at 716 ("In testing compliance with [the minimization] requirement, the courts have proceeded on a case-by-case basis,

7

invoking a standard of reasonableness."). We employ three factors in our evaluation: "(1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed." Id.

b.

Here, we conclude that regardless of whether the HCNTF minimized any of its interceptions on Thomas's phone, it complied with the mandate in the Omnibus Act. First, the "nature and scope" of Thomas's and White's criminal activities weighs in favor of unrestricted interceptions. This Court has previously recognized that "[w]hen law enforcement officials are confronted with large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps." Id.; see also United States v. Quintana, 508 F.2d 867, 874 (7th Cir. 1975) ("Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode."). The HCNTF was investigating an elaborate drug conspiracy that included at least thirteen individuals. Without a doubt, Thomas's and White's conduct was "far-flung," "on-going," and "involve[ed] multiple parties." Clerkley, 556 F.2d at 716.

8

Thus, the HCNTF had "greater latitude" in executing its wiretap than it might have otherwise had if the investigation involved fewer individuals and isolated crime. We conclude therefore that a ten-day unrestricted wiretap on Thomas's phone, when examined in light of the first reasonableness factor, satisfied the minimization requirements of the Omnibus Act. Clerkley, 556 F.2d at 716-17 ("[T]he legitimate investigation of conspiracies may necessitate the interception of all or almost all communications over a given period of time.") (collecting cases).

Second, we consider the HCNTF's "reasonable expectation" regarding the "content of, and parties to" the anticipated interceptions. Id. at 716. Here, we are concerned with whether the HCNTF had "sufficient advance knowledge" such that it could "tailor [its] minimization efforts." Id. at 717.

Outside of excerpts from the order that authorized the wiretap on Thomas's phone,[2] the record provides little assistance on this point. Nevertheless, we again conclude that the HCNTF was justified in not minimizing its interceptions. In relevant part, the order states,

---

[2] The excerpts that Thomas and White have provided here are from an order that authorized a wiretap for another defendant. Regardless, because the government has cited to these excerpts in its brief, we rely on them as accurate reflections of the authorizing order for Thomas's phone.

9

Due to the nature of this electronic surveillance investigation, . . . and the fact that personal conversations during intercepted calls may frequently be interwoven with or precede conversations of a criminal nature, initially, for the first three days, all calls intercepted will be both monitored and recorded for approximately three (3) minutes before spot monitoring will be utilized. . . . After the first three days, plant operators are to consider the previously established patterns of conversations, if any, and the identities of the conversants in determining when a conversation is of a non-pertinent nature.[3]

Although this excerpt does not provide explicit indication of the "advance knowledge" possessed by the HCNTF, its authorization to intercept the initial three minutes of all calls for the first three days implies a less-than-robust level of "advance knowledge." And this implication is bolstered by the order's grant of full discretion to plant operators in distinguishing which conversations were pertinent to the investigation. These factors lead us to again conclude that to the extent the HCNTF failed to minimize any of its interceptions on Thomas's phone, such action was reasonable.

---

[3] The record lacks any quotes from the applications and affidavits on which the authorizing judge based his finding of probable cause for issuance of the order. We note, however, that Thomas and White have not contested the district court's pre-trial finding that the order was supported by "ample probable cause." Accordingly, we rely on what the order implies regarding the facts that necessitated its issuance, viewing it in a manner that favors the government. See Jamison, 509 F.3d at 628.

10

Finally, we address the third factor, judicial supervision. As to this step, the record is silent. We may still conclude, however, that the HCNTF's presumably unrestricted interceptions were reasonable. While the Omnibus Act permits "the [authorizing] judge to ask for interim reports from the investigating agents," it does not require that the judge do so. Quintana, 508 F.2d at 875 (noting that "[t]he statute permits but does not require" interim reports); see also 18 U.S.C. § 2518(6) ("Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require."). Accordingly, even assuming that the HCNTF provided no progress reports to the authorizing judge, its unrestricted interceptions were not per se unlawful. Cf. Clerkley, 556 F.2d at 718 ("Where the authorizing judge required and reviewed interim reports, courts have been more willing to find a good faith attempt at minimization." (citing Quintana, 508 F.2d at 875)).

Having reviewed the limited record and the circumstances under which the HCNTF conducted its wiretap on Thomas's phone, we conclude that the HCNTF acted reasonably, even if it failed to minimize any of its interceptions. Simply put, Thomas and

11

White have produced no evidence that compels us to find error. And although the government's evidence is slim, we must examine it in a manner that inures to its benefit. Jamison, 509 F.3d at 628. Accordingly, we hold that the district court properly denied Thomas and White's motion to suppress the government's wiretap evidence based on their contention that the HCNTF failed to minimize its interceptions.

2.

We turn now to Thomas and White's allegation that the government violated Thomas's attorney-client privilege by intercepting his voicemail message. Evidentiary rulings are subject to harmless error review. See United States v. Cole, 631 F.3d 146, 154 (4th Cir. 2011) ("[A] conviction will not be overturned on account of an erroneous evidentiary ruling when that error is deemed harmless within the meaning of Federal Rule of Criminal Procedure 52(a)."). Under this standard, "to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997) (quoting United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995)) (internal quotation marks omitted). Here, we conclude that any violation of

Thomas's attorney-client privilege was harmless; thus, we decline to rule on whether the district court properly denied Thomas and White's suppression motion on this basis. See United States v. Banks, 482 F.3d 733, 741 (4th Cir. 2007) ("We need not decide whether the district court erred . . . because we hold that any error would be harmless . . . .").

Thomas and White allege,

> Given the obvious importance of the call, as well as the fact that the interception occurred early in the investigation, there is a substantial probability that evidence derived from the privileged and indisputably important call was improperly used as a basis for further wiretaps or was introduced at trial . . . .

And the government counters,

> [W]hile the call was pertinent from the standpoint that Thomas provided a different number than the one he was calling from, no conversations on the other phone number were ever obtained. The only line that was intercepted by investigators with regard to Thomas was the number from which he placed the call to the attorney's [voicemail] system.

The government has indicated that it did not intercept calls on the alternate number given by Thomas, and Thomas and White have provided no evidence that leads us to conclude otherwise. Moreover, Thomas's inquiry related to a civil case, not this criminal matter. Accordingly, we conclude that any violation of Thomas's attorney-client privilege was harmless, and we decline to reverse Thomas's and White's convictions on

13

the ground that the government's wiretap evidence should have been suppressed.

B.

Next, we consider the three evidentiary claims that Thomas and White failed to raise below: (1) that admission of their criminal history under Federal Rule of Evidence 404(b) was unduly prejudicial, (2) that Detective Brandon Underhill lacked sufficient credentials for portions of his expert testimony, and (3) that Underhill testified both as a fact witness and an expert witness without appropriate safeguards against jury confusion.[4]

Because Thomas and White failed to preserve these issues, our "authority to [provide a] remedy . . . is strictly circumscribed." Puckett v. United States, 556 U.S. 129, 134 (2009). Indeed, when a party does not inform a trial court of an error at the time that it occurs, the party is barred from

---

[4] The table of contents and facts section of Thomas and White's brief indicates their belief that other law enforcement officers also provided expert testimony regarding matters about which they had not been qualified as experts, and that the district court erred in admitting such testimony. Because Thomas and White failed to develop this apparent argument in the body of their brief, we decline to consider it here. See Fed. R. App. P. 28(a)(9)(A) (requiring the argument section of an appellant's opening brief to include the "appellant's contentions and the reasons for them").

raising that issue on appeal, id. at 135, unless it can show that an error "(1) was made, (2) is plain (i.e., clear or obvious), and (3) affects substantial rights," United States v. Strieper, 666 F.3d 288, 295 (4th Cir. 2012) (quoting United States v. Lynn, 592 F.3d 572, 577 (4th Cir. 2010)). Even then, we "may exercise [our] discretion to correct the error only if it 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Id. at 295 (alteration in original) (quoting Lynn, 592 F.3d at 577).

1.

First, we review Thomas and White's contention that admission of their criminal history under Federal Rule of Evidence 404(b) was unduly prejudicial. Federal Rule of Evidence 404(b) disallows admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with [that] character." Although such evidence is admissible to prove, inter alia, that a defendant had the requisite "intent" or "knowledge" to commit the crime in question, Fed. R. Evid. 404(b)(2), it becomes inadmissible if its "probative value is substantially outweighed by a danger of . . . unfair prejudice," Fed. R. Evid. 403.

15

a.

Pre-trial, the government filed a motion seeking to admit evidence of a prior narcotics conviction for each appellant and a prior firearm conviction for Thomas. The district court granted the motion, reasoning that the evidence was admissible because it related to the knowledge and intent necessary to commit the crimes for which Thomas and White were on trial. It also reasoned that the evidence would not unfairly prejudice Thomas and White under Federal Rule of Evidence 403 because it did not "involve conduct that was any more sensational or disturbing than the crimes" with which Thomas and White were charged in the present case. Accordingly, at trial, per stipulation of the parties, the government stated,

> White, on or about October 27 of 2001, was convicted and sentenced . . . for the crimes of controlled dangerous substance, manufacture, distribution of narcotics and possession with intent to distribute narcotics. This evidence is relevant to the issue of knowledge and intent regarding the crime for which the defendant stands accused.

Further, regarding Thomas, it stated,

> Thomas, on or about August 12, 1992, was convicted and sentenced . . . for the crime of conspiracy to distribute cocaine, and[,] . . . on or about October 10, 1997, was convicted and sentenced . . . for the crime of attempted distribution of cocaine[, and] on or about June 22, 1994 . . . was convicted . . . on two counts of criminal possession of a weapon in the third degree, to wit, handguns.

16

The district court then immediately instructed the jury as follows:

> This evidence is being offered only on the issue of knowledge and intent. It is not to be accepted by you that someone is a bad person because of a prior conviction, it is not to be considered by you in terms of a propensity to commit an offense. It is merely being offered on the issue of knowledge and intent, which is very important in this case, and it's being offered in that context alone and no other context.

Following this clarification from the court, the government proceeded with the remainder of its case.

After the government closed its case, but prior to presentation of defense evidence and witnesses, Juror Number 12 submitted a list of questions to the court. One of the questions said, "What is meant by the stipulation for her knowledge and not to show good or bad person?" After a bench conference in which the judge shared the questions with counsel for each party, he said to the jury, "Ladies and gentlemen, actually [J]uror Number 12, with respect to those questions, . . . I have made those questions that you have . . . known to the lawyers, they can address them in whatever fashion they want." Counsel for Thomas and White did not object to the manner in which the court dealt with Juror Number 12's questions.

During closing arguments, counsel for White and counsel for the government both referenced the purpose for which the prior

17

conviction evidence was admitted.  In its closing argument, the government stated, "Now, [counsel for White] in his opening [argument] told you that his client, I think the word he used was a p[au]per.  Most respectfully, I don't think there's any evidence for that, but I submit to you what there is evidence [of] is that he's a criminal."  Similarly, in rebuttal, the government stated,

> Mr. White's status is not the issue in this case, ladies and gentlemen.  His status is not an issue. He's a criminal.  Because the evidence that we presented over the last week establishes that he's guilty.  And as such, the government has proven his criminal conduct.  We're not here to prove his status or attack him as a person.

Again, counsel for Thomas and White recorded no objection to these statements.

Here, Thomas and White cite Juror Number 12's question and the government's statements during closing as evidence that they were unfairly prejudiced by admission of the prior conviction evidence.  We disagree.

### b.

First, Thomas's and White's prior convictions were similar to the charges they faced in this case.  Such evidence was therefore relevant to whether they possessed the requisite knowledge and intent to commit the narcotics crimes with which they were charged.  Furthermore, immediately after admission of the evidence, the court provided clear instructions to the jury

as to the legitimate implications of the prior convictions. Thomas and White argue, of course, that this limiting instruction was insufficient to assuage the prejudice that resulted. But they fail to tell us exactly what prejudice ensued. In their brief, they argue,

> When the jurors stated mid-trial that they did not understand the court's [404(b)] instructions regarding use of prior acts to establish whether the defendant is a "good or bad person," the court was presented with clear evidence of unfair prejudice . . . and [had] an obligation to take appropriate corrective measures <u>at that time</u>.

But such is not the case. First, "the jurors" did not collectively state anything regarding a lack of understanding. Rather, one juror, Juror Number 12, posed a question regarding the appropriate use of the evidence. Moreover, Juror Number 12's question did not "present[]" the court "with clear evidence of unfair prejudice." Instead, it simply revealed confusion about the court's limiting instruction. To the extent that such confusion resulted in unfair prejudice, that result is not "clear or obvious" to us, as the plain error standard requires.

Second, we decline to conclude that the government's comments during closing arguments caused unfair prejudice. Taken in context, neither comment clearly referred to White's prior conviction; rather, the statements simply urged that on the whole, the evidence presented during trial indicated that White was "a criminal." In our view, the comments referred to

19

White's status based on his actions in the present case; they did not beseech the jury to issue a guilty verdict based on White's prior criminal conduct.  To the extent that the comments were interpreted as a reference to White's prior conduct, such a result is not "clear or obvious."  Thus, we decline to reverse Thomas's and White's convictions based on the district court's admission of evidence regarding their previous crimes or the government's statements during closing argument.

2.

Next, we review Thomas and White's contentions regarding Underhill's testimony: (1) that portions of it were unsupported by a reliable methodology and (2) that it mixed fact testimony and expert testimony, such that the jury was confused.

a.

When the government called Detective Underhill to testify as an expert, he indicated that he had been employed by the Harford County Sheriff's Office for ten years and that he was presently assigned to work with the HCNTF.  He testified that he had been with the HCNTF for "just over four years" and that his primary duties were "investigations of mid to upper level drug traffickers and drug trafficking organizations in and around the Harford County area."  Underhill further testified that he had

received forty hours of specialized training related to narcotics investigations and had participated "in hundreds of arrests involving drug investigations." He also stated that he had completed course work in other specialized areas related to drug investigations and undercover operations. Underhill noted that he had acted in an undercover capacity and that in that role had purchased cocaine, crack cocaine, oxycodone, and marijuana. Underhill also attested that he had acted as a monitor of phone calls for wiretap investigations; he estimated that he had monitored between 10,000 and 15,000 drug-related phone conversations during his career. Underhill testified that he monitored the phone calls that were intercepted on Thomas's phone in this case. Relevant to such monitoring, Underhill indicated that it was "common" for drug conspirators "to attempt to conceal or code their phone conversations" and that his "training," "knowledge," and "experience" had made him "familiar with those terms and codes."

After the parties had an opportunity to examine Underhill regarding his qualifications, the court asked, "Is there any challenge to [Underhill's] expertise with respect to the matter of drug terminology and drug jargon from the point of view of the defense counsel?" Defense counsel indicated that it had no objections. The court then qualified Underhill as an expert "to testify with respect to drug jargon and drug terms and the

methodology of drug distribution," cautioning the jury that "[a]s with all witness, [it was] up to [them] to accept or reject [Underhill's] testimony."

Underhill went on to testify as to the meaning of certain phrases and terms used in the phone calls that were intercepted. For example, Underhill testified, "Jolly Rancher is a reference to crack cocaine . . . and Lassie is a reference to powder cocaine." He further testified as to the phrase "outfit in the dryer," explaining that "in the process of converting cocaine hydrochloride into cocaine base there is a drying process that has to take place and this is referencing that drying process." And as to the phrase "I don't think Shorty's dressed up," Underhill interpreted it to mean, "[a]ll [the seller] has is cocaine powder, he doesn't have any cocaine that's been cooked up into crack cocaine."

At one point during Underhill's testimony, referring to a recorded phone call that had been played for the jury, the government engaged in the following colloquy with Underhill:

Q. Detective Underhill, there's a reference to Mr. Moore telling Mr. White that he was holding that for him and Mr. White responding that he has the change for that.

A. Yes.

Q. What is that a reference to, sir?

A. Mr. Moore had cocaine for Mr. White and Mr. White was indicating that he had money for him.

22

Immediately following this testimony, without any objection by defense counsel, the court initiated a bench conference and cautioned the government to keep Underhill's testimony within "the ambit of an expert." In the court's view, "the phrase I was holding that for you in no way involve[d] expertise as to drug language." The court did not strike this testimony or instruct the jury to disregard it, however.

In addition to providing expert testimony as to the interpretation of coded words and phrases from intercepted phone calls, Underhill also testified as a fact witness regarding various aspects of the case—the circumstances of arrests, the recovery of drugs, and the execution of a search warrant. When Underhill provided this testimony, neither the parties nor the court distinguished it from the expert testimony that he provided. According to Thomas and White, "[Underhill] seamlessly transitioned between lay and expert testimony."

At the end of the trial, during its formal jury instructions, the court referenced Underhill's testimony, stating,

> In weighing [expert] opinion testimony, you may consider the witness's qualifications, his or her opinions, the reasons for testifying as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony. You may give the opinion testimony whatever weight, if any, you find it deserves in light of all of the evidence in this case. You should not,

23

however, accept opinion testimony merely because I allow the witness to testify concerning his or her opinion, nor should you substitute it for your own reason, judgment and common sense.

b.

Federal Rule of Evidence 702 governs the admission of expert testimony, stipulating, inter alia, that "[a] witness who is qualified as an expert . . . may testify in the form of an opinion . . . if . . . the testimony is the product of reliable principles and methods." Notably, Thomas and White do not challenge Underhill's qualification as an expert. They instead contest the methodology that supported his testimony, maintaining that his opinion regarding the meaning of terms and phrases was simply "rank speculation." They aver that "almost no topic of conversation was safe from Detective Underhill's leap to a connection with the drug world" and that "almost never did Detective Underhill explain the methodology he used in concluding that certain words [were] used as drug code rather than because of their plain and ordinary meaning." We conclude otherwise.

Before analyzing the intricacies of Underhill's testimony, we reiterate the well-settled principle that a "trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152

24

(1999).  Moreover, this Court has previously advised that the "test of reliability [in Federal Rule of Evidence 702] is flexible."  United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Kumho Tire Co., 526 U.S. at 141-42).  For example, experiential expert testimony is noticeably less "testable" than testimony based on pure science; nevertheless, per Rule 702, experience can still form the basis for reliable expert testimony.  Id.  Indeed, the advisory committee notes to Rule 702 explicitly contemplate the use of experiential expert testimony by law enforcement agents in a trial that involves drug transactions:

> [T]he principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities.  The method used by the agent is the application of extensive experience to analyze the meaning of the conversations.  So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed. R. Evid. 702 advisory committee's note.  Further, this Court has previously held that "law enforcement officers with extensive drug experience are qualified to give expert testimony on the meaning of drug-related code words."  Wilson, 484 F.3d at 275.

Thomas and White are concerned about the explanation of methodology (or lack thereof) that accompanied Underhill's testimony.  But our precedent does not require a law enforcement

25

officer providing experiential expert testimony to painstakingly explain his deciphering methodology. See United States v. Baptiste, 596 F.3d 214, 222-23 & n.6 (4th Cir. 2010) (holding that a district court did not commit plain error in admitting the testimony of a drug expert when that expert had not "specifically mention[ed] the word 'methodology' in his testimony" but had stated that he was experientially "familiar with the street-level jargon associated with drug trafficking" and that he decoded conversations by examining their context). Thus, to the extent that the district court erred in finding Underhill's methodology sufficiently reliable, such error was not plain.

Thomas and White are also concerned that Underhill interpreted phrases that were commonplace and not in need of elucidation by an expert. Again, we find that if the district court erred, such error was not plain. Even assuming, for the sake of argument only, that the court should have stricken Underhill's testimony regarding the phrase "I was holding that for you," we cannot ascertain that the court's failure to do so violated Thomas's and White's substantial rights, especially in light of the two instructions the court gave regarding the weight of the testimony. Accordingly, we decline to reverse the verdict on this ground.

c.

Thomas and White also contend that when Underhill "seamlessly" testified both as an expert and fact witness, the district court failed to adopt adequate safeguards to prevent jury confusion. Dual-role testimony is not per se prejudicial to a defendant. Baptise, 596 F.3d at 224. However, when a witness plays such a dual role, the district court must take precautions to ensure that the jury does not become confused and accord undue weight to fact witness testimony given by the expert. Id. (quoting Wilson, 484 F.3d at 278 n.5). Appropriate precautions include (1) having the expert witness make two separate trips to the stand and (2) issuing a cautionary instruction to the jury regarding the witness's dual role. Id.

Here, lay and expert testimony were interwoven and no cautionary instruction was issued; thus, the risk of jury confusion was high. This Court recently addressed a nearly identical circumstance in Baptiste. Although it ultimately declined to reverse the jury verdict in that case because it was constrained by a plain error standard and "the facts in the . . . case placed it in a gray area of the law," the court issued a caution regarding the handling of dual-role testimony:

> [W]e note that the district courts should take steps to ensure that there is a clear demarcation in the jury's mind between a witness's lay and expert roles. This may be accomplished, for example, by cautionary warnings or instructions, by requiring the witness to

27

> take separate trips to the stand in each capacity, or by ensuring that counsel makes clear when he is eliciting lay versus expert testimony.

Baptiste, 596 F.3d at 225 n.9.

Given our discussion of appropriate safeguards in Baptiste, and the district court's failure in this case to implement any of those safeguards, we can readily say that the court erred in not employing methods to help the jurors "understand that they [could] not give [Underhill's] lay testimony additional weight simply because of his dual-role as an expert." Id. We cannot say that the district court's error merits reversal, however. Under the plain error standard, reversal requires an obvious error that affects substantial rights. Thomas and White have failed to demonstrate how the district court's error rises to such a level. In their brief, they claim that "[t]he errors were numerous and the confusion widespread." However, they fail to cite any specific examples of this "widespread" confusion. Accordingly, we are once again constrained to uphold the jury's verdict.

## II.

Thomas and White next contend that the district court erred in declining to give a multiple conspiracies jury instruction. A multiple conspiracies jury instruction is appropriate when "the proof at trial demonstrates that [the] appellants were

28

involved <u>only</u> in separate conspiracies <u>unrelated</u> to the overall conspiracy charged in the indictment." <u>United States v. Squillacote</u>, 221 F.3d 542, 574 (4th Cir. 2000) (quoting <u>United States v. Kennedy</u>, 32 F.3d 876, 884 (4th Cir. 1994)) (internal quotation marks omitted).

The government's evidence supporting Thomas's and White's conspiracy charges consisted of (1) wiretap evidence showing contact between Michael Moore[5] and Thomas and between Moore and White and (2) evidence showing that Moore and Thomas shared customers—namely, Stokes, Leandre Preston, and Joseph Hensley, all individuals who were apprehended with Thomas and White.

At the jury charge conference, Thomas and White requested a multiple conspiracies jury instruction, maintaining that the government's evidence proved there were "essentially two distribution networks" with individual buyers and that the government made "no connection between the distribution networks and any of [the] individual buyers." The district court denied Thomas and White's request, and they contend that it erred in doing so.

"We review [a] district court's decision to give or refuse to give a jury instruction for abuse of discretion." <u>United</u>

---

[5] Michael Moore was charged with White and Thomas but is not a party to this appeal.

29

States v. Sarwari, 669 F.3d 401, 410–11 (4th Cir. 2012) (quoting United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009)) (internal quotation marks omitted). We will find refusal to give an instruction erroneous only if the requested instruction "(1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that the failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Green, 599 F.3d 360, 378 (4th Cir. 2010) (quoting Passaro, 577 F.3d at 221). Here, we conclude the district court properly denied Thomas and White's request for a multiple conspiracies jury instruction.

Thomas and White maintain that the instruction they requested was correct because "[t]he government presented no evidence that [they] had any relationship with each other, or any acquaintances of alleged co-conspirators in common." They admit that the government presented evidence that Stokes purchased her drugs from both Thomas and Moore and that White purchased his drugs from Moore, but they aver that such evidence is insufficient to show that White and Thomas were involved in the same conspiracy. We are unconvinced.

Thomas and White fail to accord sufficient weight to our precedent regarding the proof necessary for a conspiracy. A conspiracy need not "have a discrete, identifiable

30

organizational structure." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). Rather, it can be simply "a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." Id. Moreover, "[o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Burgos, 94 F.3d 849, 861 (4th Cir. 1996) (alteration in original) (quoting United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir. 1992)) (internal quotation marks omitted). In fact, proof of a conspiracy does not even require that a defendant "know all of his coconspirators." Id. Such is the case here. The government may not have outlined the organizational structure of Thomas and White's conspiracy, but it presented evidence sufficient to show that they were, at minimum, part of a "loosely-knit association of members" that existed for the purpose of drug trafficking. We therefore conclude that the district court did not act "arbitrarily or irrationally" in declining to give the multiple conspiracies jury instruction that Thomas and White requested.

III.

Finally, we address White's contention that the government presented insufficient evidence to support his conspiracy conviction. When we review a trial to determine whether sufficient evidence supported conviction on a certain charge, we view the evidence through a lens that favors the government, and we ask, "Could any reasonable juror have found the defendant guilty of this charge beyond a reasonable doubt?" See United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994).

We have reviewed the evidence that the government presented against White, and we are satisfied that it was sufficient for a reasonable juror to find White guilty of conspiracy under 21 U.S.C. § 846. White argues that the government "may have proved that a drug trafficking conspiracy existed, [but] there was no evidence to support a finding that . . . White knowingly or voluntarily participated in that conspiracy." Further, White contends that the government's circumstantial evidence of White's participation in the sale of drugs was insufficient to prove his involvement in the conspiracy. We are unpersuaded.

At trial, the government presented evidence showing that on several occasions, White called Moore to purchase powder cocaine and crack cocaine. The government also presented evidence indicating that on April 8, 2010, after White called Moore requesting cocaine, he met with Moore in a black Nissan and then

32

exited the Nissan and entered a white Dodge.  After a "brief time, approximately a minute or so," White exited the Dodge and re-entered the Nissan.  "[J]ust a couple of minutes after the meeting," law enforcement officers stopped the Dodge and discovered crack cocaine in the driver's possession.  The government also presented evidence of several other brief meetings between White and Moore.

We recognize that such evidence may seem negligible. Nonetheless, it is sufficient to support a conclusion that White participated in a conspiracy with Thomas and Moore.  And when enough evidence exists to support a reasonable juror's conclusion of guilt, we will not second-guess the verdict. Accordingly, we again decline to reverse White's conviction.


IV.

We have reviewed the evidence provided to us in the record, and we have considered each of Thomas's and White's allegations. Because we ascertain no reversible error, we affirm the jury's verdict on all counts.

<u>AFFIRMED</u>